**COLVERT v. ALABAMA BY-PROD-
UCTS CORP.**

**JACKSON v. DeBARDELEBEN
COAL CORP.**

**HALE v. DeBARDELEBEN
COAL CORP.**

**McGOUGH v. DeBARDELEBEN
COAL CO.**

Civ. A. Nos. 670-673.

United States District Court
N. D. Alabama, Jasper Division.

Oct. 26, 1953.

494

Cooper, Mitch & Black, Birmingham, Ala., and Charles Tweedy, Jr., Jasper, Ala., for plaintiffs Colvert, Jackson and Hale.

Reuben L. Newton and Charles Tweedy, Jr., Jasper, Ala., for plaintiff McGough.

Bankhead & Skinner, Jasper, Ala., and Cabaniss & Johnston, Birmingham, Ala., for all defendants.

LYNNE, Chief Judge.

Brought originally in the Circuit Court of Walker County, Alabama, and removed to this court because of diversity of citizenship between the parties and the presence of the requisite amount in controversy, these four cases were consolidated for purpose of trial because they involved common questions of law and fact.

Each plaintiff, having an occupational history of exposure to dust while performing his duties in an underground coal mine over periods in excess of twenty years, is here seeking to recover of his employer the compensation payable under Article 2A of the Alabama Workmen's Compensation Act, Code of Alabama 1940, Title 26, Section 313(1) et seq.—1951 Cum.Supp.[1]

Insisting that he has contracted the disease of occupational pneumonoconiosis and is presently suffering disability therefrom, each plaintiff contends that such disease arose out of and in the course of his employment and resulted from the nature of such employment.

Vigorously denying that its employee has the disease of which he complains, each defendant employer thereby tenders an issue of obvious complexity and one which must be met at the threshold in litigation of this class. For once the court is reasonably satisfied that such disease has been contracted, it requires little evidence and less imagination to persuade that as to the industry of mining coal underground there is attached a particular hazard of such disease that

[1] "§ 313(1). *General provisions.*—Where the employer and employee are subject to the provisions of chapter 5, Title 26, Code of Alabama 1940, as amended, the contraction of the disease of occupational pneumonoconiosis, as hereinafter defined, shall be treated as an injury by accident, and the employee, or, in case of his death, his dependents shall be entitled to compensation as provided herein. In no case, however, shall an employer be liable for compensation by reason of the contraction of the disease of occupational pneumonoconiosis, as defined herein, or for disability or death resulting therefrom, unless such disease arose out of and in the course of the employment and has resulted from the nature of the employment in which the employee was engaged under such employment. By 'nature of employment' is meant that as to the industry in which the employee was so engaged there is attached a particular hazard of such disease that distinguishes it from the usual run of occupations and is in excess of the hazards of such disease attending employment in general. (1951, No. 180, § 2, appvd. June 29, 1951.)

"§ 313(2). *Definitions.*—'Occupational pneumonoconiosis' shall mean a disease of the lungs caused by inhalation of minute particles of dust over a period of time and which said dust is due to causes and conditions arising out of and in the course of the employment without regard to whether or not said causes or conditions are inherent in the employment or can be eliminated or reduced by due care on the part of the employer. The term 'occupational pneumonoconiosis' shall include, but without limitation, such diseases as silicosis, siderosis, anthracosis, anthrasilicosis, anthraco-silicosis, anthraco-tuberculosis, tuberculo-silicosis, silico-tuberculosis, aluminosis, and other diseases of the lungs resulting from causes enumerated in this section. The term 'contraction of the disease of occupational pneumonoconiosis' as used herein shall include any aggravation of such disease without regard to the employment in which the disease was contracted. (1951, No. 180, § 3, appvd. June 29, 1951.)"

distinguishes it from the usual run of occupations and is in excess of the hazards of such disease attending employment in general.

Tried to the court without a jury, hearings were held sporadically from January 7, 1953, through April 23, 1953, to accommodate an array of eminent experts summoned from distant parts of the country. It became apparent at the outset that the ultimate decision of the issue thus tendered depended upon a choice between two clear-cut, conflicting and irreconcilable medical opinions.

Neither common knowledge nor the experience of mankind is available to resolve the highly technical and professional disagreement which runs as a common thread through the pages of a voluminous record. And juristic empiricism sheds not even a feeble ray of light upon the reality of relatively obscure disease.

Since this court may not abdicate its function and the fact must be found, some consolation is drawn from appreciation of a somewhat similar predicament with which the Supreme Court of the United States was faced in a suit between two states brought originally therein and its procedure of extrication. The opinion, delivered for a unanimous court by Mr. Chief Justice Taft, observes:

"It is difficult for a court to decide issues of fact upon which experts equal in number and standing differ flatly, and when their conclusions rest on estimates upon the correctness of which the court, without technical knowledge, cannot undertake to pass. In such cases, the court looks about for outstanding facts from which the lay mind can safely draw inferences as to the probabilities. The court is also aided by its judgment of the care and accuracy with which the contrasted experts respectively have determined the data upon which they base their conclusions." North Dakota v. Minnesota, 263 U.S. 365, 385, 386, 44 S.Ct. 138, 143, 68 L.Ed. 342.

To place the critical factual issue in these cases in proper perspective it is the task of this court to cast the medicolegal problem involved in terms of acceptable criteria for the roentgenologic diagnosis of the disease described by the statute in generic terms as "occupational pneumonoconiosis." For the heart of the disagreement between the experts who testified herein is their difference of opinion with respect to diagnostic standards.

Specialists in diseases of the chest and in radiology were marshaled on both sides of the controversy. For the plaintiffs appeared Dr. Louis L. Friedman,[2] of Birmingham, Alabama, and Dr. B.

---

2. Dr. Louis L. Friedman received a degree of Bachelor of Social Science from City College of New York and was graduated with an M. D. degree from the University of Arkansas Medical School in 1941. For one year he interned in Touro Infirmary, New Orleans, Louisiana. From 1943 to 1945 he took additional residency training at Charity Hospital in New Orleans, and served as instructor of medicine in the Louisiana State University School of Medicine. In 1945 he came to Birmingham as Assistant to Dr. Kracke, Dean of the new Medical College of Alabama and became an instructor in medicine at that institution. In the latter part of 1946 he severed this connection and opened an office in Birmingham for the practice of internal medicine, specializing in chest diseases.

He is a member of the Jefferson County Medical Association, the American Medical Association, the Board of Internal Medicine, American College of Chest Physicians, of which he is a fellow and chairman of the committee on occupational diseases of the chest, the Industrial Medical Association, being chairman of its committee on occupational diseases, and of the American Trudeau Society.

He has exhibited on the subject of coalworkers' pneumonoconiosis at the American Medical Association in 1951 in Atlantic City, at the Southern Medical Association in Dallas, Texas, and at the symposium at Saranac Lake, New

L. Gordon,[3] of Philadelphia, Pennsylvania; for the defendants, Drs. Kellie N. Joseph[4] and J. A. Meadows,[5] of Birmingham, Dr. O. A. Sander,[6] of Milwaukee, Wisconsin, and Dr. Leonard Bristol,[7] of Saranac Lake, New York.

York. By invitation of the International Council on Education of the American College of Chest Physicians, he lectured on this subject in various countries of South America. He has also written and published numerous articles on pneumonoconiosis and associated diseases of the chest.

3. Dr. Burgess L. Gordon, Mullen Professor of Medicine of the Women's Medical College, Philadelphia, Pennsylvania, graduated from Jefferson Medical College with an M. D. degree in 1919. He served his internship in the Jefferson Hospital in Philadelphia and his residency in Peter Bent Brigham Hospital, Boston. He returned to Philadelphia and became associated with the White Haven Sanitarium as visiting physician and became Director of the Department of Diseases of the Chest of the Jefferson Hospital and a member of the teaching staff of the Jefferson Medical College.

He is a member of the County and State Medical Societies in Philadelphia, of the American Medical Association, of the American College of Chest Physicians, of the Society of the American College of Physicians, and of the College of Physicians of Philadelphia.

In association with other physicians he directed a project, sponsored by the Anthracite Welfare Fund, a division of the United Mineworkers' Health and Welfare Fund, to study clinically and physiologically the lungs of coal miners with an idea of trying to explain the disability that was related to the varying degrees of structural disease. This project was widely publicized by an article appearing in the September 8, 1951, issue of The Saturday Evening Post.

4. Dr. Kellie N. Joseph was graduated with an M. D. degree from Medical College of the South in 1929, after having received premedical training at the University of the South, Sewanee. In 1940 he attended the Trudeau School of Tuberculosis, Saranac Lake, New York, for one month and in 1952 took a postgraduate course in pulmonary function at Boston City Hospital.

From 1930 until 1935 he served on the staff of the State Tuberculosis Sanitarium in Georgia and in 1935 became State Tuberculosis Clinician for the State of Alabama.

Since 1938 he has been engaged in private chest practice in Birmingham and is a member of the staff of the George Eaves Clinic, a unit of the Jefferson County Health Department.

5. Dr. J. A. Meadows was graduated from the School of Medicine, University of Alabama, with an M. D. degree and has been a practicing radiologist in Birmingham since March, 1915. He received special training in radiology at the Mayo Clinic.

He is a member of the American College of Radiology, the American Roentgen Ray Society, American Medical Association, and numerous other medical and professional societies.

6. Dr. O. A. Sander, Milwaukee, Wisconsin, was graduated with an M. D. degree from the School of Medicine, University of Pennsylvania, in 1927, after having received an A. B. degree from the University of Wisconsin. He served his internship at Mercy Hospital in Pittsburg. He had a year's residency in medicine and cardiology at the University of Pittsburg Medical School and a year of pathology, a fellowship, at the Erdheim Pathology Institute in Vienna, Austria. He served for a year and a half on the clinical staff of the Wisconsin Tuberculosis Association and since November, 1932, has been conducting a continuing survey among the dusty trades in Wisconsin, particularly in the Milwaukee area.

He is a member of the American Medical Association, state and local associations, the American College of Physicians and the American College of Chest Physicians. He is on the joint committee for pulmonary dust diseases of the American College of Chest Physicians and the Industrial Medical Association. He is also a member of the Council of Industrial Health of the American Medical Association. He teaches a course in occupational diseases of the chest at Marquette Medical School, where he is classified as an Associate in Medicine, and delivers a lecture course at the University of Wisconsin Medical School.

He has attended all of the symposia on silicosis at Saranac Lake, New York, since the first one in 1933 and has been on the program each year since 1939.

7. Dr. Leonard Bristol received an M. D. degree from Long Island College of Medicine, after having been awarded a B. A. degree by New York University. Following his graduation from medical school

They were in unanimous agreement that essential to diagnosis of the clinically significant· disease of pneumonoconiosis was roentgenographic identification of the disease in an X-ray of the chest.[8] Other criteria and their importance, in-

in 1944, he served a rotating internship at St. Catherine Hospital, Brooklyn, New York, and a twelve-month residency in radiology under Dr. Albert Lee Loomishell at Long Island Hospital. Thereafter, he entered military service as a medical officer in the United States Navy and for two years was Assistant Radiologist at the United States Naval Hospital, National Naval Medical Center, Bethesda, Maryland. After relief from active duty in the Navy, he went to Johns Hopkins Hospital as a fellow in radiology, where he remained from April, 1948, until June, 1949. Thereafter he went to Saranac Lake and became the Director of Radiology, the Edward L. Trudeau Foundation and the Trudeau Sanatorium, which positions he now holds. He is now a part-time instructor in radiology at the Johns Hopkins University Medical School, radiologist at the John Hopkins Hospital, radiologist at the Saranac Lake General Hospital and Memorial Hospital of Lake Placid and consulting radiologist at Stonywold and at Sanatorium Gabriels.

He is a member of the American Medical Association, New York State Medical Society, Franklin County Medical Association of New York, Saranac Lake Medical Society, a diplomat of the American Board of Radiology, a member of the American College of Radiology, and a member of the Northeastern New York Radiological Society.

8. There is reproduced hereinbelow testimony of the several expert witnesses pertinent to the requirement of X-ray changes in the diagnosis of significant pneumonoconiosis, despite the obvious danger and unfairness of lifting only a portion of opinion testimony from its context. This observation has equal application to the remaining footnotes.

A. Dr. Friedman:

"Q. With reference to the diagnosis of pneumoconiosis, what are the criteria that you look for in examining for that disease? A. The diagnosis of pneumoconiosis, in examining for pneumoconiosis, the identification comes from two things. Number one, the history of occupational exposure, number two, the roentgenographic identification of the disease in an X-ray of the chest. That merely identifies that disease, that is the diagnosis that this is it.

"Q. You either recognize the disease or don't? A. If· he has been a .coal miner and the roentgenogram shows it, he has it. It is a proved fact the measurement of dust concentrations in coal mines and other hazardous dusty occupations do not necessarily reflect the incidence of disease.

"Q. I believe you say X-ray identification is necessary, you have got to see the changes on the X-ray? A. Yes, sir, that is compatible with pneumoconiosis."

B. Dr. Gordon:

"Q. Do you agree that in order to make a diagnosis of pneumoconiosis you must have the three factors, adequate history of exposure, clinical findings, and X-ray manifestations? A. Yes."

C. Dr. Joseph:

"Q. In your opinion, Dr. Joseph, can clinically significant pneumoconiosis be diagnosed without X-ray changes? A. No, sir, I don't think so.

"Q. And the X-ray changes that in your opinion are required to diagnose it are what? A. Changes from the normal, particularly nodulation, not increased lung markings, and not emphysema. Those are non-specific changes that may occur, but when you get nodulation, micronodulation, you have definite silicosis or pneumoconiosis, call it what you want to."

D. Dr. Meadows:

"Q. You don't think, a man has· any kind of pneumoconiosis unless he shows nodulation in his X-ray picture, is that right? A. That is as far as I am concerned.

"Q. Is it possible in your opinion to make a diagnosis of any kind of pneumoconiosis without a nodular picture? A. I don't think from a radiological standpoint, I wouldn't from a radiological standpoint. I would have to see the nodules. A radiologist can make any kind of diagnosis he wants to. Many of them are incorrect. For me I've got to see the nodules there before I say a man has silicosis or pneumoconiosis, just like in tuberculosis or any lung disease."

E. Dr. Sander:

"Q. It is your opinion that there must be some nodulation shown in the X-ray before there can be a diagnosis of clinically significant pneumoconiosis? A. Yes, at least the pinpoint nodules."

F. Dr. Bristol:

"Q. In diagnosing coal workers pneumoconiosis what is the X-ray evidence that you consider necessary for the diagnosis?

cluding history of occupational exposure and physical examination by tests for vital capacity and maximum breathing capacity are irrelevant to the purpose of this opinion.

It is not quite to digress to note that, prior to 1947, the predominant view of the medical profession in this country was that coal dust alone did not produce a disease of the lungs but that the disease of anthraco-silicosis, sometimes found in underground coal miners, was caused by inhalation of a high proportion of free silica in association with the coal dust and was manifested in the radiograph by the presence of the classic, silicotic nodule. Indeed many specialists in this sphere of medical activity today contend that the chief offending element in soft coal dust is silica and they insist upon X-ray changes compatible with that opinion.

However, the results of studies of the Pneumoconiosis Research Unit (South Wales), conducted by Drs. C. M. Fletcher and Jethro Gough, and their associates, of Llandough Hospital, Cardiff, have wrought a change in the prevailing medical opinion in the United States. Parenthetically, this court is impressed by the fact that the South Wales Unit has made the only controlled and unbiased survey of lung diseases in soft coal workers ever undertaken by the profession. It would seem that their findings and conclusions are entitled to great weight in the minds of experts and laymen alike.

The South Wales Unit concluded that coal pneumonoconiosis is due not to the effect of silica in the lung, modified by coal dust, but to coal dust in its own right. Hence, the word "anthraco-silicosis" in describing it is inapt; preferred is a new nomenclature, including the terms, "Coalminers' Pneumoconio-sis", "Coalworkers' Pneumoconiosis" and "Pneumonoconiosis of Soft Coalworkers", used interchangeably. Leading medical authorities in this nation have accepted their demonstration and so does this court.

In an address delivered in Germany in October, 1951, Dr. C. M. Fletcher adverted to the radiographic classification of pneumonoconiosis evolved by his unit, described, with accompanying plates upon which were reproduced illustrative radiographs, in an article entitled "Coalminers' Pneumoconiosis", C. M. Fletcher and Jethro Gough, published in British Medical Bulletin, Vol. 7, January 2, 1950. Urging its international adoption, he pointed out that it had been recommended by the International Labor Office, was then being used throughout Great Britain, and had been accepted in some coalfields in France, Belgium, and Holland. The English translation of that address was received in evidence as Defendants' Exhibit 9, and the following description of the recommended system of classification is extracted therefrom:

"Normal films are indicated by the figure O. Films which suggest early pneumoconiosis by an increase in lung markings, or by some other abnormality which is not absolutely characteristic of pneumoconiosis, may be placed in a Category X. In the case of films of undoubted pneumoconiosis, there is an major sub-division between films with generalised discrete opacities, called 'simple pneumoconiosis' by the English and 'Ombres Fines' by the French, and films showing coalescent or massive shadows. The first group of films (simple pneumoconiosis) are classified into three categories of increasing abnormality, defined chiefly on the basis of the profusion of the opacities. Category 1, comprising

A. The universal requirement which I believe all workers are agreed upon are the minute opacities I spoke about just a moment ago.

"Q. We have been talking about pinhead nodules and micronodules—A. And nodules.

"Q. All right now, what are the mi-nute opacities? Is it the same as the micro-nodules and the pinhead nodules? A. That is correct, yes sir.

"Q. In other words you just classify them all under one class? A. As minute opacities, but under that you have one, two and three, or P, M, and N, pinhead, micro-nodular and nodular." ·

films showing the first appearance of characteristic opacities, often confined to the medial third of the lung; in Category 2 the opacities are widespread, but still sparse at the periphery, and in Category 3 they are profuse throughout both lung fields. The Categories 2 and 3 are further divided, according to the predominant size of opacity, into 'pinhead', 'micronodular' and 'nodular' types (Figs. 3-5). Cases showing coalescent or massive shadows are divided into four categories, A, B, C and D, chiefly according to the size of the shadows, Category D being reserved for cases showing gross thoracic distortion or emphysema."

Highly persuasive to the court is the testimony of Dr. B. L. Gordon, for the plaintiffs, that he agrees in principle with the foregoing classification [9] and the emphatic statements of Drs. Bristol [10] and Sander,[11] for the defendants, to the effect that it is currently accepted by an overwhelming majority of members of our own medical profession who specialize in lung diseases.

It is recognized that even though there might be complete agreement upon this classification, there can be no assurance that every observer, though technically skilled, will place films in the same categories. However, an untutored layman should be able to discern nodulation on a film if he is told where to look and for what he is looking.

For these and other cases this court commits itself to the classification printed above and does and will continue to require visualization of at least pinpoint nodules in X-rays of the chest before finding that a coal miner has contracted "occupational pneumonoconiosis."

In rejecting the opinions of reputable specialists who hold that clinically significant pneumonoconiosis may be diagnosed from a history of exposure to coal dust plus "reticulation" or a "lacy pattern" demonstrable upon the chest roentgenogram, this court is not so naive as to suppose that they will abandon their research or that it will forever remain impossible for them to convince their brethren of the validity of their criteria. So, too, may Dr. Friedman, who now apparently stands alone in his theory that increased linear markings alone, without reference to "reticulation" or the "lacy pattern", will support a diagnosis of such disease,[12] demonstrate its soundness to his fellow workers. But it

---

9. Dr. Gordon:
"Q. Then I take it that it is your general opinion and judgment that you do agree with Dr. Fletcher? A. Yes, I do.
"Q. That there must be evidence of some nodulation before a diagnosis of pneumoconiosis can be made? A. Yes, I think that is correct."

10. Dr. Bristol:
"Q. Have you had an opportunity to discuss and compare and study the X-rays with Doctor Fletcher? A. Yes. In 1950 Doctor Fletcher visited me in my laboratory and we spent a very enjoyable time discussing the general problems, and he brought along with him standard films, according to his classification, and he gave me a little test, and after it was all over the essence of the situation was that Doctor Fletcher and I did not differ at all in the interpretation of chest films in regard to coal workers pneumoconiosis.
"Q. Did you also see Doctor Fletcher last September? A. Yes sir. In 1952 he was back in Saranac Lake and we again discussed the problem with him and his associate Doctor Phillip Hugh Jones.
"Q. Are you familiar with the X-ray classifications that were arrived at by the Pneumonoconiosis Research Unit? A. I am. It is the same classification we use."

11. Dr. Sander:
"Q. What I am trying to get is this, from all that we have been discussing here, and from what coal miners you have seen, and from your conversations with Dr. Friedman and from your reading of Dr. Gough and his associates, is it your opinion that you can diagnose pneumoconiosis of coal workers without nodules? A. It is my opinion that you cannot make a definite diagnosis of pneumoconiosis of coal miners in the absence of at least a pinpoint nodulation and emphysema—and emphysema."

12. Dr. Friedman:
"Q. What is the X-ray manifestation of the linear type according to your ter-

is not too much to require that they should first convert the medical profession before they would convince the courts.

 Some thirty chest roentgenograms, including several of each plaintiff, were introduced into evidence and exhibited at length. No witness testified to, the court did not see thereon, the pinpoint nodulation requisite to a diagnosis of the disease in question. It follows that each plaintiff failed to sustain the burden of proof cast upon him and judgment in each case must be for the defendant.

This court is not required to, and therefore, does not, express any opinion as to the existence or cause of any disability on the part of either plaintiff, apart from the holding that, if disability there is, it was not shown to have been compensable under the statute.

minology and classification? A. The linear type is the presence of lines in the X-ray which you can see in portions of the lung, which should not be present in that portion of the lung. And also the accentuation of other linear markings in other parts of the lung where you normally have linear markings.

"Q. You coupled once or twice your statement about linear manifestations with linear lacy, do you require a lacy appearance? A. Well, now, it is not necessary. You may have, just as I demonstrated today in the lung of the gentleman who died, I call that linear. If you want to get real detail, you can just say he also had some lacy changes, but I used linear as a category.

"Q. Do you think the lacy appearance is necessary for the diagnosis? A. If the lacy appearance is linear, then it is necessary. Lacy is linear.

"Q. Of course, I am entirely ignorant about this, but I thought a lacy appearance meant the appearance of lace, a lace-like appearance, or reticulation is another word used for it as distinguished from merely the increased linear markings, the linear changes. A. The linear changes, as I pointed out, may be present in portions of the lung where they should not be, or they may be accentuated in portions where they normally may be present. Lacy characteristic or reticular characteristic in the roentgenogram is a lacy variety. I may say to you,

this is Tom Jones, Jr., or this is Tom Jones, assuming that you know him.

"Q. Without calling names, tell me, do you consider a lacy appearance is necessary to a diagnosis? A. No, it is not."
Dr. Bristol:

"Q. You know Doctor Louis Friedman? A. I have met him once or twice.

"Q. He was, I believe, at Saranac last September at the symposium? A. Yes, he was.

"Q. Are you familiar with the fact that he diagnoses or that he diagnosed coal workers pneumoconiosis from increased linear markings? A. He told me that he is able to do it.

"Q. Do you know of anyone else who does? A. No sir, I do not."
Dr. Sander:

"Q. In speaking of increased linear markings, do you know of anyone, any physician in this field who holds that increased linear markings is sufficient to diagnose coal miners pneumoconiosis or anthracosilicosis? A. I don't know of anyone other than Dr. Friedman. I never heard of any other.

"Q. Do you know of any who hold that a lacy appearance or a reticular appearance is sufficient to be diagnostic of coal miners pneumoconiosis? A. Yes, there are a number who do. As a matter of fact the British did before Fletcher tried to standardize this X-ray classification, they were holding that the lacy appearance was first evidence of coal miners pneumoconiosis."