## Raven Run Coal Company's Appeal.

*Taxation — Assessments — Valuation of coal lands — Purchase price — Appeals—Evidence—Sufficiency.*

1. The important question for determination upon appeals from the valuation of lands for purposes of taxation is what the land which is the subject of appeal would probably have brought if put up for sale at a *bona fide* public sale after public notice. In the determination of that question by a court, the members of the court sit as triers of fact, and their finding must be based upon competent evidence which is upon the record, and nothing else.

2. The price paid *bona fide* by a purchaser of land within a reasonable time before its valuation for taxation is strong evidence tending to establish its market value, but it is not conclusive.

3. Where the owner of coal lands refuses to give information within his possession, and refuses to allow representatives of the taxing authority to examine available records, and where, on account of such refusal, there is a wide discrepancy between valuations of the land as testified to by different groups of witnesses, the court is without proper evidence upon which to determine the true value.

Appeal from assessment. C. P. Schuylkill Co., Jan. T., 1923, Nos. 1a, 2a and 3a.

*George M. Roads* and *Prall B. Roads*, for appellant.

*A. L. Shay, C. A. Snyder, E. D. Smith* and *J. B. McGurl*, contra.

BERGER, J., March 10, 1924.—These three appeals, which are the first three appeals from the triennial assessment for the year 1922 upon the trial list bearing in all 301 appeals, were tried together.

### Facts.

1. The Raven Run Coal Company purchased a tract of land situated in the Townships of Butler, West Mahanoy and Union, containing 1025 acres, strict measure, for the price or sum of $900,000 for the land and improvements valued at $53,800, or $846,200 for the land itself.

2. The land was owned by eighteen different owners of undivided interests therein, each of whom made a separate deed for his interest to the Raven Run Coal Company, the earliest bearing date Oct. 28, 1918, and the last Feb. 6, 1920. The purchaser went into possession of the land Jan. 16, 1920.

3. The county commissioners, sitting as a board of revision, valued the land Sept. 5, 1922, for taxation as follows:

Raven Run Coal Company's Appeal.

### Butler Township.

| | |
|---|---:|
| Coal land, 118 A., @ $3560 per acre........................ | $420,080 |
| 7 A., @ $3560 per acre........................ | 24,920 |
| Barren land, 5 A., @ $6 per acre.......................... | 30 |
| Total............................................ | $445,030 |

### West Mahanoy Township.

| | |
|---|---:|
| Coal land, 157 A., @ $3560 per acre........................ | $558,920 |
| Barren land, 147 A., @ $6 per acre....................... | 882 |
| Total............................................ | $559,802 |

### Union Township.

| | |
|---|---:|
| Coal land, 140 A., @ $3560 per acre........................ | $498,400 |
| Barren land, 665 A., @ $4 per acre....................... | 2,660 |
| Total............................................ | $501,060 |

4. William C. Monroe and S. G. Crawford, the mining engineers in the employ of the county commissioners, on Aug. 18, 1922, reported in writing to the county commissioners, sitting as a board of revision, that they had estimated the values of all coal-bearing lands in the county for assessment purposes for the triennial period of 1922, 1923 and 1924, and that the estimated value of the appellant's lands was as follows: Butler Township, $741,750; West Mahanoy Township, $931,638; Union Township, $830,760.

5. The county's engineers estimated the value of each acre of appellant's coal land at approximately $5934 per acre, and the board of revision valued it at $3560 per acre for taxation, or on the basis of 60 per cent. of its full estimated market value. The barren lands in Butler and West Mahanoy Townships were valued at $6 per acre for taxation, and in Union Township at $4 per acre.

6. The total assessed acreage of the appellant's land in the three townships is as follows:

| | Coal | Barren | Total |
|---|---:|---:|---:|
| Butler Township...................... | 125 | 5 | 130 |
| West Mahanoy Township.............. | 157 | 147 | 304 |
| Union Township..................... | 140 | 665 | 805 |
| | 422 | 817 | 1239 |

7. Arthur W. Sheafer, representing the owners when the land was sold, and himself the owner of a large undivided interest in the land, testified that the entire tract contained 1025 acres, strict measure, but apportioned the acreage among the three townships as follows:

| | Coal | Barren | Total |
|---|---:|---:|---:|
| Butler Township...................... | 121 | 9 | 130 |
| West Mahanoy Township.............. | 168 | 127 | 295 |
| Union Township..................... | 170 | 610 | 780 |
| | 459 | 746 | 1205 |

8. Arthur W. Sheafer testified that the full market value of each acre of coal land was $1835 per acre, and that each acre of barren land was worth $5 per acre, on the basis of the acreage as stated in the 7th finding.

9. B. C. Osler, the chief engineer of the appellant, at and prior to the time of the purchase of the land, made an estimate of its probable coal content, based upon an actual examination of the land and inside workings—the land having been fully developed to the point of third and fourth mining—and, after separate consideration of each vein of coal on the land, reached the conclusion in June, 1917, before the land was purchased by his employers, that it contained 5,490,000 tons of recoverable coal in place, which would, in his opinion, yield in mining 4,839,000 tons of marketable coal. On Jan. 1, 1923, after the property had been purchased by his employers and tested by borings made upon it after its purchase, he estimated the recoverable tons in place at 5,108,000 tons, which would, in his opinion, yield 4,086,000 tons of marketable coal.

10. Mr. Osler apportioned the estimated tonnage as of Jan. 1, 1923, among the three townships as follows:

|  | Recoverable | Marketable |
|---|---|---|
| Butler Township | 688,121 | 550,497 |
| West Mahanoy Township | 1,509,388 | 1,207,511 |
| Union Township | 2,910,180 | 2,328,144 |
|  | 5,107,689 | 4,086,152 |

Note.—Mr. Osler did not fix the above stated recoverable tons in his testimony. The statement of the recoverable tonnage is the result of a calculation based on the fact that he testified that the marketable coal was 80 per cent. of the recoverable coal.

11. Mr. Osler, in arriving at his conclusions, estimated the original coal in place, excluding barrier pillars and fault areas disclosed in the mining of the property, at 20,869,000 tons, and apportioned it among the three townships as follows:

| | |
|---|---|
| Butler Township | 3,910,104 |
| West Mahanoy Township | 6,359,868 |
| Union Township | 10,599,659 |
|  | 20,869,631 |

12. William C. Monroe and S. G. Crawford, the county's engineers, estimated the entire quantity of coal originally in place upon the land at 33,154,650 tons, and apportioned it among the three townships as follows:

| | |
|---|---|
| Butler Township | 11,188,330 |
| West Mahanoy Township | 10,628,920 |
| Union Township | 11,337,400 |
|  | 33,154,650 |

13. William C. Monroe and S. G. Crawford testified that, in their opinion, 75 per cent. of the original estimated tonnage in place is recoverable coal, or 24,865,988 tons, which amount of recoverable coal, in their opinion, had been depleted by mining prior to Jan. 1, 1922, to the extent of 7,975,252 tons, leaving recoverable coal in place as of that date to the amount of 16,890,736 tons. This quantity they did not apportion among the three townships, but it may be apportioned approximately by dividing 15 cents into the values they fixed for the coal land in each of the three townships, as stated respectively in the 4th finding of fact. By this method the apportionment is as follows: Butler Township, 4,945,000; West Mahanoy Township, 6,210,920; Union Township, 5,538,400.

14. B. C. Osler testified that the depletion by mining as estimated by the county's engineers was approximately correct, but referred to the depletion in his testimony as 7,000,000 tons instead of 7,975,252 tons, as fixed by the county's engineers.

15. William C. Monroe testified that purchasers, or prospective or intending purchasers, base their offering price largely upon the quantity of coal supposed to be or known to be in place.

16. On Sept. 18, 1922, counsel for the board of revision addressed to the appellant's counsel a letter reading, *inter alia*, as follows: "Several of the coal companies and owners of coal lands voluntarily offered, and others, when requested, agreed, to furnish to the board of revision their maps of their workings for inspection and to afford the board of revision every facility for ascertaining the condition of their respective properties. On behalf of the board of revision, we inquire whether your company is willing to afford the same facilities for the inspection of your maps of the mining operations assessed. We would appreciate an answer on or before Friday, Sept. 22nd, so the board may not be longer delayed in disposing of the appeals pending before them. If this request meets with your approval, will you kindly notify us when and where this inspection may be most readily and conveniently made."

17. On Sept. 30, 1922, counsel for appellant answered the letter of Sept. 18, 1922, the answer reading, *inter alia*, as follows: "The representatives of the above companies, who have expressed themselves on the subject of your letter, feel that as the county commissioners could have had access to the maps of each of these companies by merely making a timely request to do so, and no request for information as to valuations from the representatives of these companies having been requested, and the commissioners having employed engineers whose work in assessing coal lands has been demonstrated to be absolutely unreliable, it would not advance the effort to obtain accurate information of the market value of the coal lands of the companies I represent to have these same engineers examine the maps. If an effort was made by the commissioners to nominate, for this purpose, mining engineers of acknowledged standing and experience in the anthracite fields, we would be pleased to reconsider such an effort. Regretting that the commissioners did not see fit to make this request to inspect the maps of these companies before they adopted the outrageous valuations appealed from instead of afterwards."

18. The estimate of the coal content of appellant's land, owing to the refusal of the appellant to grant permission to the county's engineers to examine it properly and to inspect it, was of necessity based upon information obtained from the State geological surveys and such other data which was available from other sources open in common to all.

19. William C. Monroe, Samuel G. Crawford and George Tappan, engineers employed by the county, placed a present market value of 15 cents per ton on each ton of recoverable coal estimated to be in place on the appellant's land; and William F. Sekol, Carl Rittenhouse and James H. Rittenhouse, other engineers employed by the county, placed a present market value of 25 cents per ton on each ton of recoverable coal estimated to be in place on appellant's land.

20. The Raven Run Coal Company, the appellant, leased its land, together with the fixtures and improvements thereon, to the Raven Run Collieries Company, which assigned its lease, presumably with the consent of the lessor, to the Hazlebrook Coal Company by writing dated Feb. 1, 1923. The lease is

recorded in the office for recording of deeds in Schuylkill County, in Miscellaneous Book No. 45, page 189.

21. From the lease, so far as the same has been read into the record by appellee's counsel, we find that it is for a term commencing Nov. 1, 1922, until all the merchantable and workable coal has been exhausted from the demised premises in all of the veins of coal on the land. The royalties for the coal to be paid monthly on the 25th day of each month.

22. The royalties to be paid are reserved in manner and amount as follows: (a) Eighteen per cent. of net price under breaker for all coal larger than rice, carried away from or sold for use on the demised premises; (b) rice coal and coal dirt, 5 cents per ton; (c) if veins from which coal is taken are on the average five feet or less in thickness between the top and bottom, the royalty on sizes above rice shall be but 12 per cent. of the price under the breaker instead of 18 per cent.; (d) a general average royalty on monthly production shall never fall below 50 cents per ton; (e) minimum monthly royalty of $7500 per month, payable monthly in advance. If coal is not mined producing such a sum monthly in royalty, credit shall be given on account of coal to be mined in the future, if and when mined in excess of the total tonnage required to produce the minimum royalty; (f) no royalties are to be paid upon a reasonable amount of coal required in mining and preparation, which, however, must pass through screens having a mesh five-sixth inch in diameter, if round, or one-fourth inch, measured at right angles to the side, if square, but larger sizes may be used, (1) for blacksmithing, (2) for outside locomotives, (3) for steam shovels, and (4) with the written permission of owners, in cases of extreme necessity, under the boiler or boilers; (g) all taxes upon surface of land and upon coal land in place to be paid by lessee.

23. B. C. Osler, the appellant's engineer, has estimated the probable life of the demised premises at a minimum of twenty-five years, with an estimated average yearly tonnage of 150,000 tons.

24. Mr. Osler also estimated the present monthly production at 15,000 tons, and the probable maximum daily output hereafter at 1000 tons, which is the peak expected to be reached in three or four years from this date, but the probable period of peak production has not been established.

25. The royalties paid on the present output, calculated in terms of money, has not been established, and it cannot be ascertained from the evidence.

### Discussion.

The important question for determination in this appeal, and in all other pending coal tax appeals, is what the land which is the subject of appeal would probably have brought if put up for sale at a *bona fide* public sale after full public notice, on or about Sept. 5, 1922; that is, what was its market value then for taxation according to our statutory mode of valuation? In the determination of that question, the members of this court sit as three triers of fact, and their finding must be based upon the competent evidence which is upon the record, and nothing else. This responsibility was described in a recent address delivered by Secretary of State Hughes, when he spoke upon a subject of vital importance to the legal profession, in these words: "The main struggle from which our highest courts are largely exempt, but which in the more humble tribunals makes up the vast extent of the activities of judges and lawyers throughout the land, is the struggle with the facts and not with the law; with the uncertainties and conflicts of testimony in pursuit of the findings of facts to which the law must be applied." And in North Dakota

*v.* Minnesota, 263 U. S. 365, a case turning largely or entirely on a question of fact upon which competent experts differed flatly, Chief Justice Taft said: "It is difficult for a court to decide issues of fact upon which experts equal in number and standing differ flatly, and when their conclusions rest on estimates, upon the correctness of which the court, without technical knowledge, cannot undertake to pass. In such cases the court looks about for outstanding facts from which the lay mind can safely draw inferences as to the probabilities. The court is also aided by its judgment of the care and accuracy with which the contrasted experts respectively have determined the data upon which they base their conclusions." These words of the present Chief Justice of the highest court of the land, and of one of its former Justices, should remind us, and the parties and their counsel, of the grave responsibility, in this and other like cases, resting upon each. In Lehigh Valley Coal Co. *v.* Northumberland County Commissioners, 250 Pa. 515, 525, Elkin, J., in remanding the record to the court below, because from it the Supreme Court was unable to determine the taxable value of the properties which were the subject of that appeal, said: "We, therefore, agree that the valuations of these six tracts should be reduced to the values testified to by the witnesses at the hearing. If the testimony as to the value of any particular tract of land is uncontradicted and is worthy of belief, that valuation should be conclusive; if the testimony be conflicting, the court must use its best judgment in determining from the weight of it what is a just valuation. Upon the record here presented we find it very difficult to formulate a decree fixing the valuation of each particular tract in controversy and have concluded to remit the record to the court below for the purpose of having final decrees entered there in accordance with the views herein expressed." Resort to the paper-books in the case just cited shows that the widest disparity between the testimony of the engineers of the respective parties in respect of values was where the appellant's witnesses placed a value of $785 per acre on the land as against $2100 per acre placed on it by the appellee's engineers.

The theory upon which the appellant presented its case is that the price paid for the land which it purchased in 1918, and of which it took possession in 1920, together with the testimony which it offered that the value of the land has not increased since then up to Sept. 5, 1922, when it was finally valued for taxation by the board of revision, is conclusive on this trial. Undoubtedly, the price *bona fide* paid by a purchaser of land within a reasonable period before its valuation for taxation is strong evidence tending to establish its market value; but, in our opinion, it is not conclusive in any case, and particularly not under the circumstances presented by the instant case. Testimony that the value of the land has not increased since its purchase is entirely negative, unless it be assumed that the purchase price paid for it conclusively established its market value at the time of payment. The land now under consideration was a completely developed tract of coal land, so that, before its purchase, the purchaser having had full and complete access to the workings, through its mining engineers, was enabled to make an estimate of the probable quantity of recoverable coal remaining in place, and the actual conditions which would attend its removal, by an actual inspection of the inside workings, as well as by the use of geological surveys and other data and information generally open to all. The value of the land depends almost entirely on its coal content, which appellant's engineer has estimated at 5,490,000 recoverable tons as of June, 1917, and, although the property has been operated since, at 5,108,000 tons as of Jan. 1, 1923. The county's engineers have estimated the recoverable tonnage as of a date shortly prior to

Sept. 5, 1922, at 20,869,631 tons; but through the refusal of the owner to permit them to enter the mine, they necessarily based their estimate entirely upon the geological surveys and other data and information generally open to all. We do not now question the right of the owner to refuse access to his mine by the county's engineers, but such refusal, if persisted in, has a tendency to create grave doubt respecting the accuracy or fairness of the estimate of the coal in place made by its engineers. In oral argument, counsel stated as one reason for denying access to the mine that the engineers employed by the county did not immediately, or soon after their employment, place themselves in touch with the owner of the land. Such conduct can hardly be used to impute unfairness to the engineers, but rather denotes that they were actuated by a desire to avoid every appearance of acting in the service of two masters. In the correspondence which passed between the parties (16th and 17th findings), the refusal to permit an inspection of appellant's property was put on the ground of the absolute unreliability of the county's engineers. In its last analysis, this implies that the owner would have permitted the engineers for the county to examine his property if the privilege had been extended to him of selecting them himself or in conjunction with the county commissioners. The officers charged with the duty of valuing real estate for taxation in our county—except in the case of coal lands—can see the property which is to be valued; but in the case of developed coal lands, unless the owner permits an inspection of that which lies within his exclusive view, the valuation by the assessors, the commissioners and the board of revision must be made without sight of the real estate to be valued. No one for the appellant has given any affirmative testimony of the market value of the land as of Sept. 5, 1922, and none of those sharing in its ownership has testified at all on any matter, other than the price paid for the land, bearing on its value.

The appellee, in the presentation of its case, has relied to a very large extent, if not exclusively, on the well-established principle that the action of the board of revision and the records of the assessment as found in the office of the county commissioners, when offered in evidence, make out a *prima facie* case in favor of the assessment, and very properly rested their case in chief on that presumption. The appellant then offered its testimony to overcome the *prima facie* case thus established, and the appellee, recognizing that the burden of going forward with the evidence, as distinguished from the ultimate burden of proof, had been shifted upon it, put in its rebuttal. The burden of proof in coal tax appeals is upon the appellant, who is the actor, and the ultimate burden of proof is never shifted from him who is obliged to maintain the affirmative of the general issue: Suravitz *v.* Prudential Ins. Co. of America, 261 Pa. 390.

The county's engineers, six in number, all testified that the probable quantity of recoverable coal in place in appellant's land is 20,869,631 tons, and three of them, Monroe, Crawford and Tappan, placed a present market value of 15 cents upon each ton of recoverable coal; and the other three, Rittenhouse, Sr., Jr., and Sekol, placed a value thereon of 25 cents per ton. These figures resolve themselves into a present market value of approximately $5934 per acre, on the basis of 15 cents per ton, or of $9890, upon the basis of 25 cents per ton. All the appellant's witnesses testified that the market value of its coal land is approximately $1835 per acre.

True to the theory upon which each of the parties has presented its case, the appellant has requested a finding of fact that the market value of its land is $1835 per acre, and the appellee a finding that the market value of it is $5934 per acre. From this it may be inferred that the purpose of appellee's

testimony placing the higher valuation on the land is merely to corroborate and strengthen the *prima facie* correctness of the board of revision's valuation—and it would doubtless require very convincing evidence to establish a higher valuation. If we had tried to arrive at the market value of appellant's land (which we have not done) upon the present state of the record, there would seem to be no rational course open, save the acceptance of one figure or the other for the market value of an acre of the land. No outstanding facts are of record upon which we could rely with safety to draw an inference of an approximately correct intermediate value. The land under consideration was leased by the Raven Run Coal Company, after its purchase, to the Raven Run Collieries Company, and it, in turn, assigned the lease to the Hazlebrook Coal Company, a corporation. Neither the date of the negotiation nor the execution of the lease has been proved, but the assignment of the lease bears date Feb. 1, 1923. The consideration for the assignment has not been shown, but the terms of the original lease have been read upon the record, and are stated in a summarized form in the 21st and 22nd findings of fact. By the use of the estimated tonnage in the land, and by the introduction of competent evidence to make certain in terms of money the royalty to be paid for each ton of coal produced by the operation of the demised premises, an actuary could readily arrive at the present market value of the land, especially if the probable production, more particularly in respect to the time during which peak production is likely to continue, were more clearly shown. A coal lease is a sale of coal in place, and the present owner, by the care used by him in ascertaining the probable quantity of the coal in place before purchasing the land, has furnished a practical illustration that coal in place is not an insignificant factor in determining the market value of coal lands. Had the officers of the corporation owning the land, and the officers of the corporation operating the land under lease, been brought into court by subpœna and cross-examined as authorized by the Act of March 30, 1911, P. L. 35, it is quite probable that additional light would have been thrown upon the question of the value of the land. Books kept by corporations usually, if not always, show the valuation by the corporation itself of the property which underlies and sustains its funded debt and capital stock. The production of such books could be enforced, and the evidence contained therein, if relevant in support of appellee's case, would be admissible against the party owning the books.

The valuation made by the board of revision is sufficient to make out a *prima facie* case in favor of the assessment; but when we have constantly before us the fact that all, or nearly all, the coal lands in our county have been valued very largely on the basis of their probable coal content, furnished to the county commissioners and the board of revision by their engineers, Monroe and Crawford, the weight of this evidence may have lost some of its force, notwithstanding the method of assessment used by them was upheld in Pardee *v.* Schuylkill County, 276 Pa. 246. It is somewhat difficult, too, to hold to the view that much additional weight is given to the estimates furnished to the board of revision by the engineers just named, made in discharge of the duties of their employment, by calling them now as witnesses. But the most important factor tending to prevent giving full weight to the *prima facie* evidence introduced by the county is the fact that approximately 150 of the 301 coal tax appeals originally open on the trial list have been tentatively settled in court, by the agreement of the parties, before our colleague, President Judge Bechtel, on some basis considerably below the values originally placed upon these lands by the board of revision; and that that body has delayed in putting the settlements into effect, by failing to have a judgment

prepared and entered in each case which has been settled, and thus we, and the appellants who have not settled their cases, have been kept in ignorance concerning the exact terms of the settlements which have been made for a period of about four months. If the county commissioners have learned that their tentative settlements are unjust or inequitable, it is their duty to obtain permission of the court to withdraw from them, and, if permitted to do so, to proceed to trial; otherwise, to put the settlements into proper effect promptly by the entry of judgment upon the record in each case which has been settled. Uniformity is a cardinal principle of taxation.

As the triers of fact, our duty is like that of jurors, and jurors, before being asked to come to a decision upon any question of fact submitted for their determination, have a right to look to the parties and their counsel for the production, in good faith, of the best evidence of which the case, in its nature, is susceptible. From the record we are unable to arrive at the taxable value of appellant's lands. The record is, therefore, remanded for such further action as the parties hereto may determine to take.

And now, March 10, 1924, record remanded, with leave to each party to take further proceedings.                    From M. M. Burke, Shenandoah, Pa.