**Francis B. BURCH, Attorney General of the State of Maryland, Counter-Plaintiff,**

v.

**GOODYEAR TIRE AND RUBBER COMPANY, Counter-Defendant.**

**Civ. No. B-75-132.**

United States District Court, D. Maryland.

July 29, 1976.

Henry R. Lord, Deputy Atty. Gen., Thomas M. Wilson, III, and Charles O. Monk, II, Asst. Attys. Gen., Baltimore, Md., for plaintiff.

Thomas D. Washburn, Ober, Grimes & Shriver, Baltimore, Md., and Marshall Cox, Cahill, Gordon & Reindel, Washington, D. C., for defendant.

## MEMORANDUM AND ORDER

BLAIR, District Judge.

This is another of the TBA cases (tires, batteries and accessories). At its inception, this suit was filed by the Cities Service Oil Company against Francis B. Burch, the Attorney General of the State of Maryland, Brooks-Huff Tire Co., and Stidham Tire Co., to enjoin the enforcement of the Maryland Antitrust Act, *Annotated Code of Maryland,* Art. 83, § 36 *et seq.*[1] Thereafter, the Attorney General counterclaimed against Cities Service and the Goodyear Tire and Rubber Co., alleging a conspiracy in restraint of trade in violation of Section 1 of the Sherman Act and also alleging illegal brokerage payments in violation of Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c). The Sherman Act violation is also alleged as a transgression of the Maryland antitrust law, which contains identical provisions governing restraint of intrastate trade. Jurisdiction over the federal claims is based upon Section 16 of the Clayton Act, 15 U.S.C. § 26. Injunctive and declaratory relief is requested in the counterclaim. The Attorney General asserts that the state law claim is pendent to the federal causes of action.

Goodyear moved to dismiss the counterclaim and that motion is the subject of this memorandum and order. After the motion was filed Cities Service and the Attorney General reached an agreed disposition of their dispute dismissing the claims between them with prejudice, but without prejudice to the Attorney General's counterclaim against Goodyear. The Cities Service complaint against Stidham has also been dismissed. Brooks-Huff has moved to dismiss the complaint, contending that the Cities Service claim against it is now moot and an order granting the motion will be entered separately. Neither Stidham nor Brooks-Huff is named as a party in the Attorney General's counterclaim.

Preliminarily, it should be noted that the Attorney General did not request leave of the court to add Goodyear as an additional party to the lawsuit. F.R.Civ.P. 13(h). Goodyear is a proper party, *see* 6 Wright & Miller, *Federal Practice & Procedure: Civil,* §§ 1434, 1435, and it asserts no prejudice arising out of the failure to file a Rule 13(h) motion. Hence leave to join Goodyear as a party will be granted.

Counts 1 and 2 of the counterclaim allege that Goodyear and Cities Service entered into a contract, combination or conspiracy to restrain horizontal competition among tire manufacturers and wholesalers and to foreclose competition for the tire replace-

---

1. According to the Cities Service complaint, Brooks-Huff and Stidham are independent resellers and distributors of tires, batteries and other automobile parts and accessories. Cities Service sold tires to Brooks-Huff and Stidham, along with fourteen other resellers and distributors, who in turn resold the tires to service station dealers, some of whom also marketed Cities Service gasoline and oil products to the public. Both Brooks-Huff and Stidham entered into consent agreements with the Attorney General following state court proceedings under Article 83, § 36 *et seq.* by which they agreed, *inter alia,* to refrain from any dealings with Cities Service for a period of five years and also to refrain from any dealings with Cities Service in which Cities Service required or suggested that Cities Service gasoline dealers purchase their TBA requirements from Brooks-Huff or Stidham.

ment market which is represented by Cities Service service station dealers.[2] Specifically, the Attorney General claims that Cities Service used its economic leverage over its service station dealers to induce the dealers to buy Goodyear tires through one of the designated tire distributors, such as Brooks-Huff or Stidham. Under the arrangement, Goodyear would sell tires to one of the distributors who in turn sold them to the dealers. Rather than bill the distributor, however, Goodyear would bill Cities Service and receive payment from Cities Service, which then billed and received payment from the distributor. In return for delivering the business of the Cities Service station dealers, Goodyear would pay a confidential discount on the price of the tires to Cities Service and would allow Cities Service the use of its distributive network. The Attorney General calls the distribution system "purchase-resale (Goodyear)" and contends that it is an effort to evade a Federal Trade Commission cease and desist order entered against Goodyear in FTC Docket No. 6486 and affirmed in *Atlantic Refining Co. v. F.T.C.,* 381 U.S. 357, 85 S.Ct. 1498, 14 L.Ed.2d 443 (1965), which banned a similar "sales commission" plan as an unfair trade practice in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45.

It is claimed that the effect of the "purchase-resale (Goodyear)" plan is to diminish competition between Goodyear and other tire manufacturers in the sale of tires to Cities Service dealers, to horizontally divide the tire replacement market, to restrain competition between sellers of Goodyear tires, and to artificially inflate the price of Goodyear tires sold at the service stations. The artificially inflated prices are absorbed by the citizens of Maryland, the ultimate purchasers of the tires, "all to the detriment of those citizens and the general economy of the State of Maryland." The alleged combination, contract or conspiracy is said to be an unreasonable restraint of trade. Moreover, the alleged confidential

discount on the sale of tires is also claimed to contravene the brokerage provisions of the Robinson-Patman Act, also to the detriment of the citizens and general economy of the State of Maryland.

Goodyear argues that the Attorney General lacks standing to maintain this suit under 15 U.S.C. § 26, and even if he has standing, that he has failed to state a claim for which relief may be granted.

### Standing

Section 26 of Title 15 provides in pertinent part:

> Any person, firm, corporation or association shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws . . . when, and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity
>
> . . . . .

The essential question is whether, assuming the allegations of the complaint are true, the Attorney General has alleged a type of "loss or damage" for which this court may give injunctive relief. Not contending that the State has suffered any financial loss in its capacity as a consumer, he instead asserts that:

> Counter-plaintiff, acting on behalf of the State of Maryland as its Attorney General, has standing to maintain this counterclaim under Section 16 of the Clayton Act . . . as a person within the meaning of that section to secure in its quasi-sovereign capacity as *parens patriae,* trustee, guardian, and representative of its citizens and general economy injunctive relief against the continuation of the violation of the Antitrust laws.
>
> . . . .

Counterclaim ¶ 3, p. 12. Goodyear submits that a mere allegation of general injury to the economy of the state is insufficient.

---

**2.** Count 2 alleges the same facts as Count 1 under the parallel provisions of Maryland law. Both parties agree that if Count 1 fails to state

a claim upon which relief can be granted, then Count 2 also fails to state a claim.

Rather, it contends the state must show an injury in its proprietary capacity in addition to damage to the quasi-sovereign interests of the state, and secondly, an injury which affects a quasi-sovereign interest of the state separate and apart from an injury which affects individuals and for which they themselves could bring suit.

The concept of *parens patriae* standing evolved out of the original jurisdiction of the Supreme Court over cases to which a state is a party under Article III, § 2 of the Constitution, *Hawaii v. Standard Oil Co.,* 405 U.S. 251, 257–259, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972). The purpose of this jurisdiction is to provide a forum for the resolution of controversies involving state governments in lieu of the sovereignty which they yielded upon forming the national government and as a substitute for diplomacy or other means of settling disputes between sovereign nations, *Louisiana v. Texas,* 176 U.S. 1, 17–19, 20 S.Ct. 251, 44 L.Ed. 347 (1900); *North Dakota v. Minnesota,* 263 U.S. 365, 372–73, 44 S.Ct. 138, 68 L.Ed. 342 (1923). Because of the origin of the jurisdiction, *North Dakota v. Minnesota, supra,* and perhaps because of the need to minimize the burden which the original jurisdiction places upon the Court, *see, e. g., Pennsylvania v. New Jersey,* 426 U.S. 660, 661–663, 96 S.Ct. 2333, 2335, 49 L.Ed.2d 124 (1976); *Ohio v. Wyandotte Chemicals Corp.,* 401 U.S. 493, 497–99, 91 S.Ct. 1005, 28 L.Ed.2d 256 (1971); *Oklahoma ex rel. Johnson v. Cook,* 304 U.S. 387, 392–93, 58 S.Ct. 954, 82 L.Ed. 1416 (1938), the jurisdiction is confined to the vindication of sovereign or quasi-sovereign interests of the states.

What constitutes a quasi-sovereign interest has not been defined with precision. Though Mr. Justice Holmes once noted that a "state has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain. . . ." *Georgia v. Tennessee Copper Co.,* 206 U.S. 230, 237, 27 S.Ct. 618, 619, 51 L.Ed. 1038 (1907), general statements fail to encompass all matters which have been found to be "quasi-sovereign." The state's interest as *parens patriae* is most evident when it seeks to preserve its natural resources, *e. g., Georgia v. Tennessee Copper Co., supra; North Dakota v. Minnesota, supra; Kansas v. Colorado,* 206 U.S. 46, 27 S.Ct. 655, 51 L.Ed. 956 (1907); or when it asks protection for the health of its citizens, *e. g., Missouri v. Illinois,* 180 U.S. 208, 21 S.Ct. 331, 45 L.Ed. 497 (1901); and *New York v. New Jersey,* 256 U.S. 296, 41 S.Ct. 492, 65 L.Ed. 937 (1921).

The Court has refused leave to file petitions in which the state is "merely litigating as a volunteer the personal claims of its citizens." *Pennsylvania v. New Jersey,* 426 U.S. 660, 665, 96 S.Ct. 2333, 2336, 49 L.Ed.2d 124 (1976). In this most recent case, Pennsylvania attempted to recover commuter taxes extracted by New Jersey from Pennsylvania citizens, but the Court refused to hear the case:

> Pennsylvania's *parens patriae* suit against New Jersey represents nothing more than a collectivity of private suits against New Jersey for taxes withheld from private parties. No sovereign or quasi-sovereign interests of Pennsylvania are implicated. *Id.* at 666, 96 S.Ct. at 2336.

As examples of cases in which a state had failed to allege a quasi-sovereign interest, the Court cited *Oklahoma ex rel. Johnson v. Cook,* 304 U.S. 387, 58 S.Ct. 954, 82 L.Ed. 1416 (1938); *Oklahoma v. Atchison, Topeka & Santa Fe Ry.,* 220 U.S. 277, 31 S.Ct. 434, 55 L.Ed. 465 (1911); and *Kansas v. United States,* 204 U.S. 331, 27 S.Ct. 388, 51 L.Ed. 510 (1907).

These three cases were also original bills in the Supreme Court. In *Oklahoma ex rel. Johnson v. Cook, supra,* the state filed suit against the shareholders of an insolvent state bank to recover sums for which the shareholders were liable under Oklahoma law. Though the state law gave the power to enforce the liability to the bank commissioner and declared the recovery of the debt a distinct economic policy of Oklahoma, the fund collected was for the benefit of the creditors and depositors of the insolvent bank. Accordingly, the real interest was

private rather than quasi-sovereign, and the bill was dismissed. In *Oklahoma v. Atchison, Topeka and Santa Fe Ry., supra,* Oklahoma complained that the defendant railroad was charging excessive freight rates to its citizens with attendant damage to the economic development of the state, and prayed injunctive relief. Though the state requested relief on behalf of its citizens generally, the right to be enforced was one which could have been brought by any of the affected persons, so the case did not fulfill Article III, § 2 requirements. Plaintiff in *Kansas v. United States, supra,* claimed title to certain Indian land as trustee for a railroad. Because, under the operation of the statute in question, the beneficiary of the suit was the railroad rather than the state, the suit was not one within the original jurisdiction of the Supreme Court. *See also Jones ex rel. Louisiana v. Bowles,* 322 U.S. 707, 64 S.Ct. 1043, 88 L.Ed. 1551 (1944); *Land O'Lakes Creameries, Inc. v. Louisiana State Board of Health,* 160 F.Supp. 387 (E.D.La.1958) (three-judge court).

█ Injury to the general economy of a state may, however, be appropriate for protection by the state government in a *parens patriae* capacity. In *Georgia v. Pennsylvania R.R. Co.,* 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945), an original bill to enforce the Sherman Act, Georgia claimed that twenty railroad companies had combined and conspired to restrain trade by setting discriminatory railroad rates which preferred the ports of other states to those of Georgia, and asked for damages and an injunction. Regarding Georgia's standing the Court wrote:

> Georgia, suing for her own injuries, is a "person" within the meaning of § 16 of the Clayton Act; she is authorized to maintain suits to restrain violations of the anti-trust laws or to recover damages by reason thereof. *Georgia v. Evans,* 316 U.S. 159, [62 S.Ct. 972, 86 L.Ed. 1346]. But Georgia is not confined to suits designed to protect only her proprietary interests. The rights which Georgia asserts, *parens patriae,* are those arising from an alleged conspiracy of private persons whose price-fixing scheme, it is said, has injured the economy of Georgia. Those rights are of course based on federal laws. The enforcement of the criminal sanctions of these acts has been entrusted exclusively to the federal government. See *Georgia v. Evans, supra,* p. 162 [62 S.Ct. 972, p. 974]. But when it came to other sanctions Congress followed a different course and authorized civil suits not only by the United States but by other persons as well. And we find no indication that, when Congress fashioned those civil remedies, it restricted the States to suits to protect their proprietary interests. Suits by a State, *parens patriae,* have long been recognized. There is no apparent reason why those suits should be excluded from the purview of the anti-trust acts.

\* \* \* \* \* \*

> It seems to us clear that under the authority of these cases Georgia may maintain this suit as *parens patriae* acting on behalf of her citizens though here, as in *Georgia v. Tennessee Copper Co., supra,* [206 U.S. 230], p. 237, [27 S.Ct. 618, p. 619, 51 L.Ed. 1038], we treat the injury to the State as proprietor merely as a "makeweight."

\* \* \* \* \* \*

> If the allegations of the bill are taken as true, the economy of Georgia and the welfare of her citizens have seriously suffered as the result of this alleged conspiracy. Discriminatory rates are but one form of trade barriers. They may cause a blight no less serious than the spread of noxious gas over the land or the deposit of sewage in the streams. They may affect the prosperity and welfare of a State as profoundly as any diversion of waters from the rivers. They may stifle, impede, or cripple old industries and prevent the establishment of new ones. They may arrest the development of a State or put it at a decided disadvantage in competitive markets.

\* \* \* \* \* \*

These are matters of grave public concern in which Georgia has an interest apart from that of particular individuals who may be affected. Georgia's interest is not remote; it is immediate. If we denied Georgia as *parens patriae* the right to invoke the original jurisdiction of the Court in a matter of that gravity, we would whittle the concept of justiciability down to the stature of minor or conventional controversies. There is no warrant for such a restriction.

324 U.S. at 447, 450–51, 65 S.Ct. at 721–723.

The Court had occasion to reexamine *Georgia v. Pennsylvania R.R. Co.* in *Hawaii v. Standard Oil Co.,* 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972), a case which began when the State of Hawaii filed suit in a district court asking for an injunction and damages from several oil companies which were accused of conspiring to fix the retail price of gasoline and other petroleum products. Hawaii sued in its capacity as a consumer of petroleum products, and also as *parens patriae* requesting damages to be measured by the effect of the conspiracy on the overall economy of the state rather than the sum lost by individual consumers in Hawaii.

Whether Hawaii, which had not alleged discrimination against it different from other states, could properly sue for injunctive relief was not before the Court. It confined its attention to the question of whether Hawaii could recover treble damages un-der § 4 of the Clayton Act, 15 U.S.C. § 15, for injury to its economy, *id.* at 259, 92 S.Ct. at 889, and concluded that it could not do so. Since Hawaii had also sued in a proprietary capacity, the question of standing for injunctive relief was not critical to the lawsuit, *id.* at 261, 92 S.Ct. 885.

Nonetheless the basis of the Supreme Court's decision, as read by this court, represents a reaffirmance of *Georgia v. Pennsylvania R.R. Co.* and an extension of a state's ability to sue for an antitrust injunction as the trustee of its citizens. First, the Court noted that Section 16, which is at issue in this case, requires only "threatened loss or damage." Section 4, at issue in *Hawaii,* is limited to one injured in his "business or property." Second, the Court contrasted the danger of multiple recovery in a *parens patriae* damage claim with the unitary direction and effect of an injunction.[3] Third, the Court denied any potential damage recovery not because Hawaii had failed to allege a real and cognizable injury, but because Congress has not chosen to include such a recovery within the ambit of Section 4 of the Clayton Act. In sum, the Court could have chosen to hold that Hawaii had no standing as *parens patriae,* but instead chose to resolve the issue on the basis of limiting a damage recovery rather than on broader questions of standing.[4]

Shortly after the holding in *Hawaii,* the court encountered another motion for leave to file a bill of complaint under the original

**3.** "While the United States Government, the governments of each State, and any individual threatened with injury by an antitrust violation may all sue for injunctive relief against violations of the antitrust laws, and while they may theoretically do so simultaneously against the same persons for the same violations, the fact is that one injunction is as effective as 100 . . . . . The parties are in virtual agreement that whether or not Hawaii can sue for injunctive relief as *parens patriae* is of little consequence so long as it can seek the same relief in its proprietary capacity. While some theoretical differences may exist with respect to the parties capable of enforcing a *parens patriae* injunction as opposed to one secured by a State in its proprietary capacity, these differences are not crucial to a defendant in an antitrust case." *Id.* at 261, 92 S.Ct. at 890–891.

**4.** The Ninth Circuit had directed dismissal of all the *parens patriae* claims in *Hawaii,* including the demand for injunctive relief, 431 F.2d 1282, 1286; 405 U.S., at 256, 92 S.Ct. 885. Though the order of the Court of Appeals was affirmed, this did not foreclose the availability of injunctive relief for purely economic injury.

The Ninth Circuit opinion in *Hawaii* speaks only of damages, and as noted earlier the additional claim for damages and injunctive relief by the state as proprietor made the *parens patriae* claim for injunctive relief largely unnecessary. Whatever doubt the result may have cast upon the meaning of the opinion is clarified by *In re Multidistrict Vehicle Air Pollution M.D.L. No. 31,* 481 F.2d 122 (9th Cir. 1973).

jurisdiction by eighteen states against the nation's four largest automobile manufacturers charging a conspiracy to suppress the development of motor vehicle pollution control devices and requesting injunctive relief, *Washington v. General Motors Corp.*, 406 U.S. 109, 92 S.Ct. 1396, 31 L.Ed.2d 727 (1972). As a matter of discretion, leave to file the complaint was denied without any intimation that the plaintiffs lacked standing.

Our jurisdiction over the controversy cannot be disputed. *Georgia v. Pennsylvania R. Co.*, 324 U.S. 439 [65 S.Ct. 716, 89 L.Ed. 1051]; *Georgia v. Tennessee Copper Co.*, 206 U.S. 230 [27 S.Ct. 618, 51 L.Ed. 1038]. 406 U.S. at 112, 92 S.Ct. at 1397. Simultaneously, multi-district litigation concerning the same litigation was pending before the District Court for the Central District of California, *id.* at 116, n. 7, 92 S.Ct. 1396. The Ninth Circuit considered the standing of the state plaintiffs as *parens patriae* upon certification from the District Court, *In re Multidistrict Vehicle Air Pollution M.D.L. No. 31*, 481 F.2d 122 (9th Cir. 1973). There, too, injunctive relief was sought by the states in their *parens patriae* capacity because of general economic injury to their states, and with little ado the court found that standing was present:

In *Georgia v. Pennsylvania Railroad Co.*, *supra*, the Supreme Court upheld Georgia's *parens patriae* action under section 16 for an injunction against a conspiracy between large railroad companies. The analysis of that case rendered in *Hawaii, supra*, 405 U.S. at 259–60 [92 S.Ct. 885], bespeaks the continuing availability of *parens patriae* actions under section 16 for injunctive relief for injuries to a state's economy. Insofar as the state appellees have alleged injury to their economies, they have standing under section 16.

*Id.* at 131.

Goodyear argues that *Georgia, Hawaii* and *In re Multidistrict Vehicle* are distinguishable from the allegations presented herein. Georgia complained of discrimination against it as a state rather than a broad based antitrust violation which affected it in the same manner as all of the other states. The conspiracy charged in *Washington* and *In re Multidistrict Vehicle* was the control of air pollution, well within the states' traditional interest in their environment. And in *Hawaii*, the nature of the alleged injury under Section 16 of the Clayton Act was not squarely before the Court.

This court, however, is not asked to decide what types of injury may be redressed by the State of Maryland in its *parens patriae* capacity in all types of cases; the sole issue is whether this alleged injury, general damage to the economy of the state, is sufficient to maintain an action under Section 16 of the Clayton Act. The economy of a state, and therefore those private actions having a significant bearing thereon, is certainly one of the major concerns of state government and perhaps only slightly less urgent than public health and safety.

Goodyear also contends that the instant complaint is in fact for the benefit of various Cities Service service station dealers rather than the public at large, resting this argument upon *Oklahoma ex rel. Johnson v. Cook, supra,* and *Oklahoma v. Atchison, Topeka and Santa Fe Ry. Co., supra.* In those cases, however, particular individuals, creditors of insolvent banks and shippers using a particular railroad, stood to obtain a direct monetary benefit from the state's complaint. Goodyear does not claim that any particular service station operator in this case will receive any monetary gain as a result of the lawsuit. Further, the argument reaches too far. Any suit by a state on behalf of its citizens as a whole will benefit some of its citizens more than others. It is likely that elimination of the discriminatory rates alleged in *Georgia* would more likely have assisted ratepayers than other persons. Persons with respiratory conditions might well gain more from the relief sought in *In re Multidistrict Vehicle* than would other citizens. The premise of the antitrust laws is that an anticompetitive injury felt acutely by a few is also an injury to the commonweal. The fact that

some will benefit more than others is not a barrier to maintenance of this lawsuit.

The countervailing considerations, some of which have been advanced by Goodyear, are by no means lacking in weight. Unfortunately a good number of the cases which one must resort to as authority involved questions of whether the case presented fell within the Supreme Court's original jurisdiction and if it did whether that jurisdiction should be exercised. The intertwining of the standing of a state as *parens patriae* with questions of original Supreme Court jurisdiction has left the authorities a bit murky. It can be argued with some force, and Goodyear does so argue, that Congress made a deliberate choice in vesting the enforcement of the antitrust laws in the Attorney General of the United States, the Federal Trade Commission, the State in its proprietary capacity and any individual threatened with loss or damage. An economic injury, it can be said, will almost assuredly impinge upon identifiable individuals and Congress has constituted them private Attorney Generals who, should they prove their case, may recover treble damages, attorney fees and costs. It can also be argued with some force that an injury to the economy is not of the magnitude as an injury to the state's environment or public health. It can be said that the concept of standing arises out of the policy of the law favoring concrete problems litigated by direct adversaries and that to confer standing on the Attorney General of a state under the circumstances presented in this case would be to confer standing on the Attorney Generals of the fifty states and to permit suits by lawyers without clients. These considerations and others made by Goodyear are not without weight and were this court privileged to write on a clean slate it would most likely conclude that the Attorney General of Maryland lacks standing to bring this suit.

■ The slate, however, is not clean. This court's interpretation of that which has been written leads it to conclude that the Attorney General of Maryland does have standing to bring this suit.

## Sherman Section 1

■■ Assuming that the Attorney General has standing, Goodyear says that he has failed to state a violation of the Sherman Act for which relief can be granted, F.R.Civ.P. 12(b)(6). The standard which Goodyear must meet is stringent indeed:

Dismissal of a Sherman Act claim on motion . . . should be "sparingly practiced." *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, [82 S.Ct. 486, 7 L.Ed.2d 458] (1962). "[T]o state a claim upon which relief can be granted under that section [§ 1, Sherman Act], allegations adequate to show a violation and * * * that plaintiff was damaged thereby are all the law requires." *Radiant Burners, Inc. v. Peoples Gas, Light & Coke Co.*, 364 U.S. 656, 660, [81 S.Ct. 365, 367, 5 L.Ed.2d 358] (1961). Disposition on motion is not warranted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, [78 S.Ct. 99, 102, 2 L.Ed.2d 80] (1957). *South Carolina Council of Milk Producers, Inc. v. Newton*, 360 F.2d 414, 420 (4th Cir.1966).

Goodyear contends that the violation alleged is merely a transgression of the decree entered in *Atlantic Refining Co. v. F. T. C.*, 381 U.S. 357, 85 S.Ct. 1498, 14 L.Ed.2d 443 (1965), which arose under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, and which the Attorney General is powerless to enforce. Secondly, Goodyear contends that even if the Attorney General has alleged a tying relationship between Cities Service and its dealers, such an allegation does not imply illegal conduct by Goodyear.

■ The scope of Section 5 of the Federal Trade Commission Act is broader than that of Section 1 of the Sherman Act since the former prohibits all "unfair trade practices." On the other hand, a showing that particular conduct violates Section 5 does not insulate it from potential Section 1 liability as well. Arrangements between oil

companies and their dealers similar to that alleged in this complaint have, in some instances, been found to violate Section 1 of the Sherman Act, *see Osborn v. Sinclair Refining Co.*, 286 F.2d 832 (4th Cir.1960); *Phillips v. Crown Central Petroleum Co.*, 395 F.Supp. 735, 765 (D.Md.1975).

The complaint thus alleges a tying scheme by Cities Service, and also alleges that Goodyear agreed with Cities Service to carry out the tying scheme by paying Cities Service a commission in return for the tied sale of tires to service station dealers. Goodyear is also said to have agreed not to solicit sales from the Cities Service dealers except through the tying scheme. Such conduct may constitute horizontal market allocation and a concerted boycott in violation of Section 1, *Klor's v. Broadway-Hale, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *United States v. General Motors*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). Without Goodyear's participation the scheme would not have been feasible.

 More importantly, the Attorney General need not allege a *per se* violation of the Sherman Act to survive a motion to dismiss. All that is required is an allegation of a conspiracy, contract or combination which unreasonably restrains interstate commerce, *Radovich v. National Football League*, 352 U.S. 445, 453, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957). Counts 1 and 2 make such allegations. The complaint states a claim upon which relief may be granted and Goodyear's motion to dismiss will be denied.

### Robinson-Patman claim

 Count 3 of the counterclaim charges Goodyear with making illegal payments in lieu of brokerage to Cities Service for the sale of tires to its dealers in violation of Section 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c).

The particulars of the claim are that Goodyear paid Citgo a seven percent discount on orders of tires, of which three percent was passed on to authorized tire distributors who resold the tires to the Cities Service station dealers. Though Cities Service was the nominal buyer of the tires, the tire distributors made the actual orders for the tires and received shipments. Paperwork was routed through Cities Service in order to obtain the discount, and in return for the discount Cities Service coerced its dealers into buying Goodyear tires from the designated tire wholesalers. Thus, the Attorney General concludes, Cities Service received a payment for obtaining sales for Goodyear without any business justification except the "harnessing" of its market power over the dealers. In so doing, Cities Service acted as the *de facto* agent or broker for the tire distributors who in fact controlled the amount of sales by placing the orders for tires with Goodyear.

Goodyear contends that the complaint fails to state a claim because the purchasing system is in fact a permissible quantity discount, citing *Central Retailer-Owned Grocers, Inc. v. F. T. C.*, 319 F.2d 410 (7th Cir.1963) and *Empire Rayon Yarn Co. v. American Viscose Corp.*, 364 F.2d 491 (2d Cir.1966) (en banc), *adopting* 354 F.2d 182 (2d Cir. 1965) (dissenting opinion of Moore, J.). Secondly, Goodyear suggests that the section requires that the payment be to the ultimate buyer or to a person who is under the control of the ultimate buyer, relying upon *Cornwell Quality Tools Co. v. C. T. S. Co.*, 446 F.2d 825 (9th Cir.1971).

Broadly speaking, Section 2(c) prohibits payments by a seller to a buyer or to a direct or indirect agent for a buyer as a reward for the consummation of a sales transaction except in those instances where the buyer or his agent actually performs services for the seller who pays the commission, fee or other compensation. The proscription of Section 2(c) is not confined to formal commercial "brokerage" arrangements, but also includes, for example, illegal payments, *Rangen v. Sterling Nelson & Sons, Inc.*, 351 F.2d 851 (9th Cir.1965); *Fitch v. Kentucky-Tennessee Light & Power Co.*, 136 F.2d 12 (6th Cir.1943). Whether the defendant is purchasing on his own account or for others is of little relevance,

*Southgate Brokerage Co. v. F. T. C.*, 150 F.2d 607 (4th Cir.1945).

The court is of the opinion that the Attorney General's counterclaim states a claim upon which relief may be granted. His allegation is quite simply that Goodyear made payments to Cities Service, whether buying on its own account or as the *de facto* agent for others, which had no commercial justification. Goodyear's assertion of such a justification is contradicted by the complaint, which for purposes of this motion must be taken as true.

Prudential factors also militate against peremptory dismissal of Count 3. Inasmuch as the court has concluded that Counts 1 and 2 state a claim upon which relief may be granted, it is likely that the same evidence which would be adduced to prove those counts will be material to the issues raised in Count 3. The trial of this case, should it come to pass, will be before a judge rather than a jury, reducing the likelihood of confusion in the mind of the trier of fact. Once evidence is presented, the court will be in a far better position to weigh the legal validity of the Attorney General's Robinson-Patman theory.

The court expresses its appreciation to all counsel for the very helpful briefs which have been submitted.

Accordingly, it is this 29th day of July, 1976, ORDERED:

1. That leave to join Goodyear as a Counterclaim Defendant BE, and the same IS hereby, GRANTED;

2. That Goodyear's motion to dismiss the counterclaim BE, and the same IS hereby, DENIED.