### In re MONTGOMERY COUNTY REAL ESTATE ANTITRUST LITIGATION.

### STATE OF MARYLAND ex rel. Francis B. BURCH

v.

### JACK FOLEY REALTY, INC., et al.

### Civ. No. B–77–618.

United States District Court,
D. Maryland.

May 30, 1978.

Francis B. Burch, Atty. Gen. of Md., Thomas M. Wilson, III, and Charles O. Monk, II, Asst. Attys. Gen. of Md., Baltimore, Md., for plaintiff.

B. George Ballman, Staley, Prescott & Ballman, P.A., Kensington, Md., and John H. Lewin, Jr., James K. Archibald, Venable, Baetjer & Howard, Baltimore, Md., for defendants Jack Foley Realty, Inc. and John P. Foley, Jr.

E. Austin Carlin, Murphy & Carlin, Bethesda, Md., and Raymond W. Bergan, Robert P. Watkins, Williams & Connolly, Washington, D. C., for defendants Bogley, Inc. and Robert W. Lebling.

Charles N. Shaffer, Peter I. J. Davis, Rockville, Md., for defendant Shick and Pepe Realty, Inc.

William B. Somerville, Smith, Somerville & Case, Baltimore, Md., and James P. Mercurio, Lewis E. Leibowitz, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D. C., for defendant Shannon & Luchs Co.

John G. Gill, Jr., Rockville, Md., William W. Cahill, Jr., Weinberg & Green, Baltimore, Md., and Richard A. Hibey, Robert Wallace, Surrey, Karasik & Morse, Washington, D. C., for defendants Colquitt-Carruthers, Inc. and John T. Carruthers, Jr.

Edwin Collier, Collier & Shaffer, Silver Spring, Md., William O. Bittman, George R. Clark, Pierson, Ball & Dowd, Washington, D. C., for defendant Robert L. Gruen, Inc.

## MEMORANDUM AND ORDER

BLAIR, District Judge.

This is a civil antitrust action brought by the State of Maryland, in the person of its Attorney General Francis B. Burch, under sections 4C and 16 of the Clayton Act, 15 U.S.C. §§ 15c and 26, as amended by Title III of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, Pub.L. 94–435, 90 Stat. 1394, 15 U.S.C. § 15c *et seq.* (Sept. 30, 1976). Additionally, a pendent claim is brought under Md.Com.Law Code Ann. § 11–204(a)(1), a part of the Maryland Antitrust Act. Jurisdiction over the federal claim is based upon 28 U.S.C. § 1337. Jurisdiction over the state law claim is based upon this court's pendent jurisdiction.

Maryland, suing as *parens patriae* on behalf of natural persons within the State,

alleges that defendants, six corporate real estate brokers doing business in Montgomery County, Maryland and the presidents of three of those corporations, conspired to fix brokerage commission rates in violation of section 1 of the Sherman Act, 15 U.S.C. § 1. This purported Sherman Act violation is also alleged as a transgression of the parallel provision in the Maryland Antitrust Act, Md.Com.Law Code Ann. § 11–204(a)(1). The operative language of the complaint is identical to that found in an indictment returned against these same defendants on April 1, 1977 in *United States v. Jack Foley Realty, Inc., et al.,* Criminal B–77–0185. In both the complaint and the indictment the defendants are alleged to have done the following:

    (a) communicated to one another at a meeting and on other occasions the intention to raise commission rates to 7 percent on listings of residential real estate in Montgomery County; and

    (b) jointly adopted a policy of increasing commission rates on listings of residential real estate in Montgomery County to 7 percent.

With respect to the federal claim, Maryland requests treble damage relief for injury to the property of persons who sold residential real estate in Montgomery County through the services of the defendants on or after September 30, 1976, the effective date of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C. § 15c *et seq.* This damage claim is based on the allegation that, as a result of the alleged conspiracy, sellers of residential real estate in Montgomery County paid commission rates higher than those they would have paid but for defendants' unlawful acts. In addition to damages, Maryland requests declaratory and injunctive relief. This request is made as part of both the federal and state law claims. Presently pending before the court are two unresolved motions: defendants' motion to dismiss and the joint motion of the State of Maryland and the United States to permit disclosure of grand jury materials to the Attorney General of Maryland. Each of these matters is dealt with separately below.

### Motion to Dismiss

Defendants have moved to dismiss the complaint on three separate grounds, two of which are closely related. They argue first that this case is not properly a *parens patriae* action under either § 4C or § 16 of the Clayton Act because Maryland has not alleged injury to the general economy of the State, but rather has brought this action on behalf of a "small and uniquely affected portion of its population." Simply stated, this argument is that the State lacks standing to maintain this lawsuit. Secondly, defendants contend that §§ 4C and 16 of the Clayton Act, to the extent they are construed to grant standing to the State to sue on behalf of its citizens, violate the case or controversy provisions of Article III, § 2 of the United States Constitution. Finally, defendants assert that the State has failed to allege facts sufficient to charge defendants with conspiracy to restrain *interstate* commerce in violation of § 1 of the Sherman Act, thereby depriving this court of the necessary subject matter jurisdiction.

■ On September 30, 1976, President Ford signed into law the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C. §§ 15c *et seq.*, 18a, 1311 *et seq.* (the Act). Title III of the Act, 15 U.S.C. § 15c *et seq.*, added to the Clayton Act certain provisions allowing state attorneys general to bring *parens patriae* actions for the recovery of damages on behalf of their states' natural citizens where those citizens were injured by violations of the Sherman Act. The heart of Title III of the Act is found in the new § 4C(a)(1) of the Clayton Act, 15 U.S.C. § 15c(a)(1), which provides:

    Any attorney general of a State may bring a civil action in the name of such State, *as parens patriae on behalf of natural persons residing in such State,* in any district court of the United States having jurisdiction of the defendant, to secure monetary relief as provided in this section for injury sustained by such natural per-

sons to their property by reason of any violation of [the Sherman Act]. The Court shall exclude from the amount of monetary relief awarded in such action any amount of monetary relief (A) which duplicates amounts which have been awarded for the same injury, or (B) which is properly allocable to (i) natural persons who have excluded their claims pursuant to subsection (b)(2) of this section, and (ii) any business entity.

(Emphasis added). Defendants' contention that the State may not maintain an action under this section where it has failed to allege injury to its general economy is founded on the historical application of the *parens patriae* notion to antitrust suits. A brief examination of this history will facilitate an understanding of the issues raised by defendants' argument.

The developmental background of the *parens patriae* concept in this country is closely interwoven with cases brought by states under the original jurisdiction of the Supreme Court pursuant to Article III, § 2 of the Constitution. *See generally Hawaii v. Standard Oil,* 405 U.S. 251, 257–59, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972); *Burch v. Goodyear Tire & Rubber Co.,* 420 F.Supp. 82, 86 (D.Md.1976), *aff'd,* 554 F.2d 633 (4th Cir. 1977). This original jurisdiction is confined to instances where sovereign or quasi-sovereign interests of the states are at issue, *Oklahoma ex rel. Johnson v. Cook,* 304 U.S. 387, 393, 58 S.Ct. 954, 82 L.Ed. 1416 (1938), and may not be invoked where the state is "merely litigating as a volunteer the personal claims of its citizens." *Pennsylvania v. New Jersey,* 426 U.S. 660, 665, 96 S.Ct. 2333, 2336, 49 L.Ed.2d 124 (1976). The overlapping of *parens patriae* issues with questions concerning the availability of this limited original jurisdiction makes it somewhat difficult to define with precision the boundaries of *parens patriae* standing. Nevertheless, it is clear that under certain circumstances states have historically been granted the right to bring actions in other than their proprietary capacity. *See, e. g., North Dakota v. Minnesota,* 263 U.S. 365, 373–74, 44 S.Ct. 138, 68 L.Ed. 342 (1923); *Georgia v. Tennessee Cooper Co.,* 206 U.S.

230, 237, 27 S.Ct. 618, 51 L.Ed. 1038 (1907). This is particularly true in cases where violations of the antitrust laws were alleged.

In *Georgia v. Pennsylvania R.R. Co.,* 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945), a Sherman Act claim brought by Georgia against twenty railroads, the Supreme Court specifically addressed the question of *parens patriae* standing:

Georgia, suing for her own injuries, is a "person" within the meaning of § 16 of the Clayton Act; she is authorized to maintain suits to restrain violations of the anti-trust laws or to recover damages by reason thereof. *Georgia v. Evans,* 316 U.S. 159, 62 S.Ct. 972, 86 L.Ed. 1346. But Georgia is not confined to suits designed to protect only her proprietary interests. The rights which Georgia asserts, *parens patriae,* are those arising from an alleged conspiracy of private persons whose price-fixing scheme, it is said, has injured the economy of Georgia. Those rights are of course based on federal laws. The enforcement of the criminal sanctions of these acts has been entrusted exclusively to the federal government. See *Georgia v. Evans, supra,* p. 162, 62 S.Ct. 972. But when it came to other sanctions Congress followed a different course and authorized civil suits not only by the United States but by other persons as well. And we find no indication that, when Congress fashioned those civil remedies, it restricted the States to suits to protect their proprietary interest. Suits by a State, *parens patriae,* have long been recognized. There is no apparent reason why those suits should be excluded from the purview of the anti-trust acts.

*Id.* at 447, 65 S.Ct. at 721. Thus, the Court found that Georgia had *parens patriae* standing to sue for injunctive relief where injury to the State's general economy was alleged. *See also Burch v. Goodyear Tire & Rubber Co.,* 554 F.2d 633 (4th Cir. 1977), *aff'g,* 420 F.Supp. 82 (D.Md.1976); *In Re Multidistrict Vehicle Air Pollution M.D.L. No. 31,* 481 F.2d 122, 131 (9th Cir. 1973), *cert. denied,* 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973).

In *Hawaii v. Standard Oil Co., supra,* 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972), an attempt was made to expand the *Georgia* holding to allow damage recovery in a *parens patriae* antitrust action. Hawaii alleged that the defendants had violated § 1 of the Sherman Act, 15 U.S.C. § 1, in numerous ways resulting in injury to the general economy of the State. In its prayer for relief Hawaii sought, among other things, a monetary recovery to remedy this alleged injury to its general economy. After a thorough review of the history of *parens patriae* actions, with particular emphasis on the *Georgia* case, the Supreme Court held that Hawaii did not have standing to maintain the lawsuit. The Court reasoned that Hawaii's allegation of injury to its general economy did not constitute injury to its "business or property" as required by § 4 of the Clayton Act, 15 U.S.C. § 15. The Court also noted the practical difficulties of placing a dollar value on such an amorphous injury and further observed that to allow such an action to proceed might well result in duplicative recovery against antitrust defendants.

*California v. Frito-Lay Inc.,* 474 F.2d 774 (9th Cir.), *cert. denied,* 412 U.S. 908, 93 S.Ct. 2291, 36 L.Ed.2d 974 (1973), was, like *Hawaii,* an attempt on the part of a state to bring a *parens patriae* damage action to remedy an alleged violation of the Sherman Act. It was, however, a suit different from *Hawaii* as to the theory on which it was based—a difference which is critical to the resolution of the issue presently before this court. In *Frito-Lay,* the State of California alleged that twelve manufacturers of snack foods had conspired to fix and maintain prices in violation of § 1 of the Sherman Act. Responding to this alleged conspiracy, the state brought suit, not on its own behalf, but on behalf of its citizens who were injured by the charged illegal conduct of the defendants. Thus, the case was fundamentally different from *Hawaii,* which was an attempt to recover for injury to the general economy of the state—a quasi-sovereign interest. *Frito-Lay,* on the other hand, was a representative action where the state did not allege injury to its quasi-sov-

ereign interests but rather prayed for relief on behalf of its citizen-consumers who had suffered from defendants' conduct. In describing the action before it, the Ninth Circuit observed:

> It would thus appear that the state is seeking to act here not as *parens patriae* in the sense in which that term is recognized in this country, but as guardian *ad litem* for the disabled members of the class it purports to represent.

*Id.* at 776. (Footnote omitted).

The *Frito-Lay* court concluded that California lacked standing to bring this representative action on behalf of its consumers, but in so doing issued an invitation for legislative action to overrule its decision:

> The state most persuasively argues that it is essential that this sort of proceeding be made available if antitrust violations of the sort here alleged are to be rendered unprofitable and deterred. It would indeed appear that the state is on the track of a suitable answer (perhaps the most suitable yet proposed) to problems bearing on antitrust deterrence and the class action as a means of consumer protection. We disclaim any intent to discourage the state in its search for a solution.

> However, if the state is to be empowered to act in the fashion here sought we feel that authority must come not through judicial improvisation but by legislation and rule making, where careful consideration can be given to the conditions and procedures that will suffice to meet the many problems posed by one's assertion of power to deal with another's property and to commit him to actions taken in his behalf.

*Id.* at 777–78.

Defendants' lack of standing argument, when viewed in light of prior *parens patriae* decisions, is more easily understood. Their position is that the new § 4C(a)(1) of the Clayton Act was designed to incorporate the historical concept and interpretation of *parens patriae* into Sherman Act damage actions. Put another way, defendants con-

tend that § 4C(a)(1) was a legislative overruling of *Hawaii v. Standard Oil, supra.* Thus, they argue, as in *Hawaii,* the state as *parens patriae* plaintiff must allege injury to its general economy in order to have standing to sue. While logical on its face, this argument cannot withstand even a cursory analysis of the legislative history of the Act, which clearly shows that § 4C(a)(1) was designed, not to overrule *Hawaii,* but rather to overrule *Frito-Lay,* thereby allowing the state to maintain the representative type *parens patriae* action which was disallowed in that case.

Section 4C(a)(1) itself provides that a state attorney general may sue "on behalf of natural persons residing in [the] State . . . ." This language, on its face, supports the conclusion that Congress intended to permit representative suits by attorneys general. Also notable is the fact that a provision in the Senate version of the *parens patriae* bill which would have permitted suits for injury to a state's general economy, as well as the representative type action, was excluded while that bill was in the Senate Judiciary Committee. *See* Senate Rep. No. 803, 94th Cong., 2d Sess. 80 (1976) (hereinafter cited as Senate Report).[1] *See* also Scher, *Emerging Issues Under the Antitrust Improvements Act of 1976,* 77 Colum.L.Rev. 679, 715 (1977). This indicates that the Senate considered the difference between the *Hawaii* type action and the *Frito-Lay* type action and believed that the *Frito-Lay* type was acceptable while the *Hawaii* type was not.

The House Report on H.R. 8532, 94th Cong., 2d Sess. (1976), the bill which was eventually enacted into law with amendments not relevant here, also demonstrates that Congress intended to allow state attorneys general to sue on behalf of the state's injured consumer regardless of the existence or non-existence of injury to the general economy. This intention is manifested in the committee's explanation of the purpose of the *parens patriae* bill:

The purpose of H.R. 8532 is to provide a new federal antitrust remedy which will permit State attorneys general to recover monetary damages on behalf of state residents injured by violations of the antitrust laws. The bill is intended to compensate victims of antitrust offenses, to prevent antitrust violators from being unjustly enriched and to deter future antitrust violations.

H.R.Rep.No.94–499, 94th Cong., 1st Sess. 3, *reprinted in* [1976] U.S. Code Cong. & Admin. News, p. 2572 (hereinafter cited as House Report). Furthermore, the House Report specifically discussed the *Frito-Lay* decision, setting out in full the above quoted language from that case which invited legislative action to permit representative type *parens patriae* actions. House Report at 8. After quoting the *Frito-Lay* invitation the committee went on to add:

H.R. 8532 is a response to the judicial invitation extended in *Frito-Lay. The thrust of the bill is to overturn Frito-Lay by allowing State attorneys general to act as consumer advocates in the enforcement process,* while at the same time avoiding the problems of manageability which some courts have found under Rule 23 [of the Federal Rules of Civil Procedure].

*Id.* at 8, U.S. Code Cong. & Admin. News 1976, p. 2578 (emphasis added).

Similar sentiments are found in the Senate Report where it is said that the *parens patriae* provision of S. 1284

. . . is the legislative response to restrictive judicial interpretations of the notice and manageability provisions of Rule 23 of the Federal Rules of Civil Procedure and of the rights of consumers and States to recover damages under section 4 of the Clayton Act and to the Ninth Circuit's invitation [in *California v. Frito-Lay*] for legislative action. . .

Senate Report at 40–41 (Footnote omitted).

When this legislative history is considered it becomes obvious that the defendants' lack

---

1. An early version of the Senate bill, S. 1284, 94th Cong., 1st Sess. (1975), which contained the provision allowing suits for injury to a state's general economy is reprinted in the Senate Report. *See* Senate Report at 101, 110.

of standing argument must fail. The fact that Maryland has failed to allege injury to its quasi-sovereign interest, in the form of its general economy, is immaterial under § 4C(a)(1). To the contrary, this action is precisely the type of suit which was authorized by the Act—a suit brought by the state attorney general to redress alleged injury to its consumer citizens resulting from claimed antitrust violations. As a result, defendants' motion to dismiss the state's damage claim for lack of standing will be denied.

Apart from Maryland's claim for damages under § 4C(a)(1) of the Clayton Act, it has requested injunctive relief pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26. The State seeks to enjoin the alleged illegal activity which it contends caused the damages compensable under § 4C(a)(1). While the defendants have not specifically briefed the issue, there would seem to be some question regarding the State's standing to secure *injunctive* relief where it fails to allege injury to its quasi-sovereign interest. This question is somewhat academic in light of the state's viable pendent claim in count two of the complaint, which also seeks injunctive relief. Nevertheless, defendants' motion does raise this issue, thereby necessitating its resolution by this court.

■ As shown above, it is beyond peradventure that the state has standing, under § 16 of the Clayton Act, to maintain a suit for injunctive relief where it alleges injury to its general economy. *Burch v. Goodyear Tire & Rubber Co., supra,* 420 F.Supp. 82, 90 (D.Md.1976). Here, however, the state has failed to allege such an injury. Notwithstanding the absence of such an allegation, and despite the fact that the standing provision of § 16 of the Clayton Act was not directly amended by the Act,[2] this court believes that to allow Maryland to bring a damage suit to redress an alleged antitrust violation while forbidding the maintenance of an injunctive action based on the same set of facts would be improper. As noted

by the Fourth Circuit's opinion in *Burch v. Goodyear Tire & Rubber Co., supra,* 554 F.2d 633, 635 (4th Cir. 1977), Congress, by passing the Act, manifested an intention to continue to allow *parens patriae* actions for injunctive relief. The statements of Representative Rodino and Senator Hart, quoted in *Burch,* show that Congress did not amend § 16 of the Clayton Act only because it felt that such an amendment was unnecessary. *Id.* at 635 nn. 2 & 3. Thus, Congress believed that state attorneys general would be able to secure injunctive relief in any action properly brought under § 4C(a)(1). This court agrees and believes that it would be an incongruous affront to common sense to permit the state to recover damages on behalf of its injured consumer citizens, but deprive it of the right to seek to terminate the illegal activity which caused those damages. Accordingly, this court holds that the state has standing to seek injunctive relief for the claimed violations of § 1 of the Sherman Act.

■ This brings the court to defendants' constitutional argument. In this regard they contend that to allow Maryland to maintain this lawsuit would violate the strictures of Article III, § 2 of the Constitution, which requires that a case or controversy between plaintiffs and defendants be asserted. The defendants rely upon *Warth v. Seldin,* 422 U.S. 490, 499–501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), for the proposition that constitutional standing requires a plaintiff to demonstrate actual injury to himself as a result of the defendant's act. They claim that such injury is lacking here.

This argument, which was considered and summarily rejected by the Senate Judiciary Committee, Senate Report at 61, ignores the true nature of the *parens patriae* standing granted by the Act. As discussed above, the Act allows a state attorney general to sue as representative of the state's consumer-citizens. Thus, no new substantive right was created by the Act. Rather, "[i]t simply created a new procedural de-

---

2. Section 16 was amended by the Act to allow the recovery of attorney's fees in any action brought under its provisions. *See* 15 U.S.C.

§ 26. This amendment is, of course, irrelevant to the discussion of standing to maintain an injunctive action.

vice—*parens patriae* actions by the States on behalf of their citizens—to enforce existing rights of recovery under § 4." *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 733–34 n. 14, 97 S.Ct. 2061, 2069, 52 L.Ed.2d 707 (1977). *See also* House Report at 9. This new procedural device is analogous, as the Ninth Circuit had previously suggested in *Frito-Lay,* to the state acting as "guardian *ad litem.*" 474 F.2d at 776.

In *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), the Supreme Court enunciated the rule which is controlling here:

> [I]n terms of Article III limitations on federal court jurisdiction, the question of standing is related only to whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution.

*Id.* at 101, 88 S.Ct. at 1953. Plainly, this action is, and has been, presented in an adversary context. Moreover, representative type suits have historically been permitted by the courts. Here the state, as a statutory representative, stands in the shoes of its injured citizens. Viewing its position as such, there is no constitutional barrier to its maintenance of this action. Congress certainly has the power to appoint the state as an advocate for wrongs perpetrated upon its citizenry, particularly where those wrongs might otherwise go unredressed. The defendants' motion to dismiss on the ground that this action violates Article III, § 2 of the Constitution will therefore be denied.[3]

Defendants' contention that this court lacks subject matter jurisdiction due to a failure on the part of the plaintiff to allege a conspiracy in restraint of *interstate* commerce has been previously addressed in this court's Memorandum and Order of July 29, 1977 in *United States v. Jack Foley Realty,*

*Inc., et al.,* Criminal No. B–77–0185 (D.Md.). For the reasons stated in that Memorandum and Order,[4] defendants' lack of subject matter jurisdiction argument must fail. The motion to dismiss will therefore be denied.

### *Motion to Permit Disclosure of Grand Jury Materials*

The United States and the State of Maryland have jointly moved for an Order permitting disclosure to the State of all grand jury materials, including transcripts, presently in the possession of the United States. The defendants have responded, opposing any such disclosure.

Section 4F(b) of the Clayton Act, 15 U.S.C. § 15f(b), added by the Hart-Scott-Rodino Act, provides that:

> To assist a State Attorney general in evaluating the notice [by the Attorney General of the United States of potential actions under the Clayton Act] or in bringing any action under this Act, the Attorney General of the United States shall, upon request by such State attorney general, make available to him, to the extent permitted by law, any investigative files or other materials which are or may be relevant or material to the actual or potential cause of action under this Act.

By letter of April 20, 1977, the Maryland Attorney General, through his designee, requested access to investigative files of the Justice Department relating to this case. Responding to this request by letter of June 3, 1977, the Acting Assistant Attorney General in charge of the Antitrust Division indicated that, subject to appropriate limitations on its use and further disclosure, the Justice Department had no objection to furnishing this material.

Defendants contend, however, that § 4F(b) does not alter the rule of grand jury

---

**3.** This same result was reached in the case of *In Re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation MDL 150,* 1978–1 Trade Reg. Rep. (C.C.H.) ¶ 61,839 (C.D.Cal.1978), the only other case of which this court is aware which has considered this question.

**4.** A copy of this Memorandum and Order has previously been filed in this case in response to defendants' motion to dismiss the complaints of the private plaintiffs. *See* Court Paper # 50 (October 19, 1977).

secrecy set forth in *United States v. Procter & Gamble,* 356 U.S. 677, 682, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958), where it was held that access to grand jury materials can be had only upon a showing of particularized need. This court disagrees, finding that the language of § 4F(b), and the legislative history relating thereto, authorizes the disclosure of grand jury materials to the state.

In commenting on a similar, earlier version of § 4F(b), the House Judiciary Committee said:

> Whenever a State attorney general so requests, in order to evaluate the notice from the U.S. Attorney General or in order to bring a parens patriae action, section 4F(b) requires the U.S. Attorney General to make the Justice Department's investigative files available to the State attorneys general "to the extent permitted by law." *This means that the files are to be made available except where specifically prohibited.*

House Report at 17, U.S. Code Cong. & Admin. News 1976, p. 2586 (emphasis added). This demonstrates a Congressional intention to create an exception to the general rule of grand jury secrecy.[5] The provision in the statute requiring disclosure of investigative files "to the extent permitted by law" does not run contrary to this conclusion. There is no provision specifically prohibiting the disclosure of grand jury materials to the state. Fed.R.Crim.P. 6(e) places such disclosure within the court's power. Section 4F(b) indicates that the court is to exercise this power and allow disclosure when the United States has in its possession materials which may be helpful to the state in its prosecution of a Clayton

Act action. Disclosure, therefore, will be ordered in this case.[6] All grand jury material received by the state pursuant to this order shall be used solely in connection with this lawsuit and shall not be disclosed to any other person. Exceptions to these limitations may, of course, be made by this court or any other court of competent jurisdiction.

For the reasons stated above, it is this 30th day of May, 1978, by the United States District Court for the District of Maryland,

ORDERED:

1. That defendants' motion to dismiss be, and the same hereby is, DENIED.

2. That the United States of America make available to the Attorney General of Maryland and his authorized employees all grand jury documents and transcripts that relate to its investigation of possible antitrust violations by Montgomery County real estate brokers and *United States v. Jack Foley Realty, Inc., et al.,* Criminal No. B–77–0185.

3. That the use or disclosure of these grand jury materials be subject to the following limitations unless otherwise ordered by this court or any other court of competent jurisdiction:

(a) The materials shall be used solely in connection with the prosecution of this case; and

(b) The materials shall not be disclosed, in whole or in part, to any other person, except to the extent that such materials have become part of the public record in this or related litigation.

---

5. Defendants argue that remarks of Senator Abourezk made during the final Senate debates on the Act show a contrary intention. The Senator, in addressing § 4F(b), stated:

> The section specifically limits the Attorney General's power to release documents to whatever his powers are under existing law. Under existing law, he cannot turn over materials given in response to a grand jury demand or to a civil investigative demand. Therefore, the section is limited by existing law to cases where materials were turned over voluntarily. This section is in the bill,

because it was requested by the members of the House conferees, who had met on this. 122 Cong.Rec. S. 15,333 (daily ed. Sept. 7, 1976). While not to be lightly disregarded, the Senator's statements cannot alter the plain language of the statute. Moreover, these remarks, made in the course of a heated floor debate, are not as reliable an indicator of Congressional intent as the considered judgment of the House Committee as expressed in its report.

6. The criminal case was tried to a jury and all defendants were convicted on September 28, 1977. An appeal is pending.